UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

PAULA PAYNE

VERSUS

WEST FELICIANA PARISH
SCHOOL BOARD, ET AL.

CIVIL ACTION

NO.: 05-820-JJB

## RULING AND ORDER

On October 2, 2006, this court ordered the parties to file respective motions for summary judgment vis-a-vis the plaintiff's, Paula Payne ("Plaintiff"), First Amendment claims of employment retaliation (doc. 27). The defendants consist of the West Feliciana School Board ("Board"), the superintendent of the West Feliciana School System ("WFSS"), Lloyd Lindsey ("Lindsey"), and the principal of West Feliciana High School ("WFHS"), Michael Thornhill ("Thornhill"). The defendants have collectively filed their motion for summary judgment (docs. 30, 32), to which Plaintiff filed an opposition (doc. 35). Plaintiff, however, asserts that she is unable to file a motion for summary judgment in good faith because genuine issues of material fact remain in dispute for trial (doc. 29). Lastly, the defendants filed a reply brief to Plaintiff's opposition to summary judgment (doc. 36). The court only addresses Plaintiff's claims of First Amendment employment retaliation, as its order was only related to said claims. The court is called upon to answer a federal question, and therefore subject matter jurisdiction over the action is proper. 28 U.S.C. §1331.

## Factual Background

The summary judgment evidence, when viewed in a light most favorable to Plaintiff, accounts for the following. The setting for this controversy is the WFHS in St. Francisville, Louisiana. Plaintiff is a former teacher in the WFSS. She previously taught at the WFHS for twelve years in the English department. Plaintiff and one Ms. Alma ("Kent") were the two teachers at the WFHS assigned to teach all of the English II classes, which consisted by-and-large of sophomore students. Semesters are broken into six week segments at the WFHS. The teachers assign grades to the students which are entered into the students' academic records. For the first six week grades of the fall 2004 academic session, approximately 70% of the English II students received either D's or F's. The low scores reflected a disparity with the students' grades in other subjects as well as with English-course grades for the freshman, junior, and senior students.

Plaintiff and Kent alerted Thornhill as to the poor performance of their English II students before grade reports for the first six weeks were issued. Thornhill initially responded by advising that he would discuss the matter with both of the teachers after the report cards were issued. According to Plaintiff, Thornhill seemed supportive of the teachers at that point.

On October 11, 2004, and after report cards were issued, Thornhill ordered Plaintiff and Kent to meet with him in order to discuss the issue of the low grades. Thornhill was concerned that because grades were cumulative for the semester

2

and that low grades in the first six weeks had added significance, the students getting D's and F's would be starting out in a hole from which they would have to dig themselves out for the rest of the semester.  At the meeting, Plaintiff and Kent were directed to change the students' grades.  While Plaintiff initially told Thornhill that the students were working harder and their second six-week grades would likely reflect their hard work, Thornhill stressed that he wanted Plaintiff to change the first six-week grades.  According to Plaintiff, Thornhill stated, "Now you can scream and holler and do whatever you want to, but you're going to do this." Thornhill allegedly told Plaintiff that he was tired of hearing about "the house of Payne" and that he wanted a change.[1]  Plaintiff thought it best to remain quiet and not say anything regarding changing the grades.

At the time of Thornhill's order to change the grades, the WFHS had a school policy handbook.  A specific provision on "Grade Alteration" was included.  That provision stated,

No School Board member, Superintendent, or school employee, including administrative and supervisory personnel, shall attempt, directly or indirectly, to influence, alter, or otherwise affect the grade received by a student from his teacher. However, a teacher's determination of a student's grade may be changed or altered when the Superintendent or designee has determined that the grade is in error, or that the grade is demonstrably inconsistent with the teacher's grading policy.[2]

---

[1]The "house of Payne" is a nick name the students at the WFHS labeled Plaintiff. Payne Tenure Hearing, Tr. at pg. 145.

[2]Plaintiff's Exhibit H.  The school policy on grade alteration generally tracks the language of La. Rev. Stat. §17:414.2.

3

After leaving Thornhill's office, Plaintiff contacted her union representative, Mr. Wayne Frea. Frea told Plaintiff that Thornhill's order was illegal and that she did not have to change the grades as directed. Plaintiff followed Frea's advice and refused to change her students' grades. Kent, on the other hand, acquiesced to Thornhill's orders and changed her students' grades.

After learning that Plaintiff refused to change the grades, Thornhill, through Kent, approached Plaintiff on October 29, 2004 with a threat to change the grades or else suffer a demotion and become the Behavior Modification Clinic ("BMC") teacher. As Plaintiff testified, a BMC teacher was basically a "babysitter for the criminals at school."[3] Plaintiff was ordered to meet with Thornhill to discuss the matter further on November 5, 2004.

One day before the November 5 meeting, Plaintiff delivered a memo to Thornhill's secretary informing Thornhill that her union representative would be present for the meeting. Plaintiff also sent Thornhill a letter in which she addressed her reasons for not changing her students' grades. Permeated throughout that letter is Plaintiff's position that changing a student's grade without a corresponding showing of satisfactory work on the part of the student would send the "wrong message,"–that in life, so long as one makes enough noise, he or she can get what he or she wants.

_____

[3]<u>Deposition of Plaintiff</u>, pp. 30-32, 108-111.

4

Upon receipt of Plaintiff's letter, Thornhill arrived at Plaintiff's classroom in the morning of November 5 and summoned Plaintiff to the hallway. Thornhill allegedly informed Plaintiff, "I got your memo and your letter and there will be no meeting. There will be no representative there."[4] Thornhill ordered Plaintiff to meet with him during her "off hour." Plaintiff responded by stating that she would meet with Thornhill only with her union representative present. According to Plaintiff, Thornhill scorned, "You're going to be sorry about this. You're going to be sorry for this. You need to think about this. This burns me."[5]

Plaintiff arrived at Thornhill's office during her "off hour" on November 5, without her attorney or union representative present. Thornhill informed Plaintiff that the superintendent, Lindsey, had suspended her for five days without pay.[6] Lindsey's suspension notice, dated November 5, 2004, stated that the reason for the suspension was Plaintiff's refusal to meet with Thornhill and himself without a union representative present. Lindsey stated that Plaintiff's actions constituted willful neglect of duty. The letter ended by informing Plaintiff that the matter would be referred to the Board for consideration of disciplinary action.[7] Following her

---

[4]*Id.* at pg. 34.

[5]*Id.* at pg. 35.

[6]Although Lindsey's letter stated that Plaintiff's suspension was "without pay," that was not the case. There is no dispute between the parties that Plaintiff received her full pay during her five day suspension.

[7]Plaintiff's Exhibit B.

Case 3:05-cv-00820-JJB-CN   Document 37   02/07/07   Page 5 of 29

suspension, Plaintiff continued to refuse to change her students' grades. Thornhill, in again ordering her to change the grades, advised Plaintiff to "lose her morals" in order to keep her job.[8]

At Plaintiff's tenure hearing with the Board, Lindsey testified that "not much investigation" took place before suspending Plaintiff. He stated that his decision "was a reaction to the refusal to meet with us [Thornhill and Lindsey]" and that it was based upon "a pretty spontaneous discussion."[9] Lindsey, however, admitted that he was aware that Plaintiff did meet with Thornhill on November 5, as originally scheduled, and without her union representative.[10]

Lindsey testified that the scheduled meeting with Plaintiff was only intended to be informational, and therefore a union representative was not necessary. Lindsey testified that the reason he wanted to meet with Plaintiff and Thornhill was to address "instructional concerns," which he addressed as follows,

I had many instructional concerns. I had instructional concerns that we had a huge drop-off in the 10th grade from the amount of honor students – almost half would take in the 9th grade then jump back in the 11th grade. Kind of yo-yo thing, I had instructional concerns that I talked about when I looked at that chart, 70%. I had instructional concerns of the major philosophy; one of our major philosophies ... that I talk to all teachers we've had for two or three years. It's called the Three Rs. Rigor, I have no question of [Plaintiff's] rigor; relevance; and relationships. Two of those, I thought were very fractured, relevance and relationships. And that was

---

[8]<u>Deposition of Plaintiff</u>, pp. 48-50.

[9]<u>Payne Tenure Hearing</u>, Tr. at pg. 99.

[10]<u>Id</u>. at pg. 100.

6

my instructional concerns with this type of format.[11]

Following Plaintiff's five day suspension, Lindsey, on November 16, 2004, sent Plaintiff a letter explaining that he was charging her with willful neglect of duty.[12]  Lindsey stated that he intended to seek Plaintiff's termination from the Board.  The substance of Lindsey's November 16 charge of willful neglect of duty was once again based on Plaintiff's alleged refusal to meet with Thornhill and himself on November 5 without her union representative present.  A hearing on Lindsey's charge was set by the Board for January 25, 2005.

On January 15, 2005, Plaintiff wrote a letter to all of the Board members informing each of them that Thornhill and Lindsey had repeatedly ordered her to change her students' grades.[13]  Her letter consisted of arguments as to why the Board should reject Lindsey's charge, and also espoused her belief that changing grades in the manner that Thornhill and Lindsey suggested was contrary to the interests of the students and the public.

Immediately prior to the January 25 tenure hearing, Plaintiff was contacted by Channel 9, WAFB.  Plaintiff gave WAFB interviews and made statements to the media regarding being ordered to change the English II students' grades.[14]  Plaintiff

---

[11]*Id*. at pg. 98.

[12]Plaintiff's Exhibit C.

[13]Plaintiff's Exhibit D.

[14]Plaintiff's Exhibit L.

7

told the media that not only were Thornhill's and Lindsey's commands to change the grades illegal, but also that doing so would harm the children of West Feliciana Parish.[15]

At the close of Plaintiff's tenure hearing, the Board found that Plaintiff was guilty of willful neglect of duty, in violation of La. Rev. Stat. §17:443. She was accordingly punished with a suspension, without pay, from January 26, 2005 through March 11, 2005, to be followed by probationary status until the end of the 2004-2005 academic year.[16] At the hearing, Lindsey referred to Plaintiff's statements to the media as "[t]here's been a media blitz, but we haven't done it."[17] This was in response to a question by Plaintiff's counsel asking whether Lindsey had any understanding as to why Plaintiff refused to meet with him without her union representative present.

Upon Plaintiff's return to the WFHS following her suspension, Thornhill allegedly stated that "he didn't appreciate the media," presumably referring to Plaintiff's comments to WAFB. Plaintiff was then reassigned to a "library monitor" position, as opposed to her previous full-time position teaching the English classes. All of her classes, except for two, were removed.[18] Plaintiff's first and second period

---

[15]*Id*.

[16]Payne Tenure Hearing, Tr. at pp. 188-192.

[17]*Id*. at 100.

[18]Plaintiff's Exhibit G.

8

English II classes were changed to "tutoring;" however there were no students to tutor.[19]  Her fifth and sixth period English II classes were changed to "study halls," one of which only had four students.[20]  Thornhill also allegedly told Plaintiff that she was "not going to complain" about anything because if she did, then he would remember it and she would "be out."  Lindsey allegedly told Plaintiff that he also did not appreciate the reports to the media.  According to Plaintiff, Lindsey told her that "there had been a death in [the] school family and that people in the community did not appreciate having had a funeral in the community for one of our students and then seeing something like this on the news at the same time."[21]  These events were eventually followed by Plaintiff's letter of resignation on June 23, 2005.[22]

### Standard of Review

Summary judgment is proper when the moving party demonstrates a lack of a genuine issue of material fact and the party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(C); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d 557, 559 (5th Cir. 1997).  The moving party has the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

[19]*Plaintiff's Exhibit F*.

[20]*Id*.

[21]*Deposition of Plaintiff*, pg. 59.

[22]*Plaintiff's Exhibit F*.

9

with affidavits, if any, which it believes shows an absence of a genuine issue of material fact.  *See Celotex Corp.*, 477 U.S. at 323.

After the moving party has met its initial burden, the non-moving party is required to set forth facts, by affidavits or otherwise, showing that a genuine issue of material fact exists.  *Topalian v. Ehrman*, 954 F.2d 1125, 1132 (5th Cir. 1985). In determining whether summary judgment is proper, the court views the evidence, and all reasonable inferences drawn therefrom, in a light most favorable to the non-moving party.  *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988).

## Discussion

The court now turns to the merits of Plaintiff's claims.  Specifically, she claims that the defendants retaliated against her for engaging in the following protected activities: (1) her refusal to engage in an illegal act, namely changing her students' grades; (2) her written protest letter to each Board member; and (3) her contact with the media.[23]  Plaintiff's retaliation claims are based on her alleged speech as a "public employee."  She brings her First Amendment claims pursuant to 42 U.S.C. §1983.

Section 1983 provides that any person, under color of law, who deprives a person of "any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper

---

[23]*Plaintiff's Memorandum Regarding First Amendment Claims*, pg. 7.

Case 3:05-cv-00820-JJB-CN   Document 37   02/07/07   Page 10 of 29

proceeding for redress ...."  While Section 1983 does not provide any substantive rights, it provides a vehicle for individuals who seek restitution for violations of certain rights. _Harrington v. Harris_, 118 F.3d 359, 365 (5th Cir. 1997). "Rather than creating substantive rights, §1983 simply provides a remedy for the rights that it designates.  Thus, an underlying constitutional or statutory violation is a predicate to liability under §1983." _Johnston v. Harris Co. Flood Control Dist._, 869 F.2d 1565, 1573 (5th Cir. 1989).

Plaintiff's complaint alleges, _inter alia_, that the Board, Lindsey, and Thornhill retaliated against her for exercising her First Amendment rights.  At the outset, the court strives to be analytically sound as to the precise constitutional amendment that Plaintiff seeks to apply §1983.  The First Amendment, by itself, provides no protection to Plaintiff's alleged speech. The First Amendment is a limitation on the power of Congress–the federal legislature.  It does not apply to state government action.  However, although the First Amendment explicitly refers only to federal action, it applies to state actions by incorporation through the due process clause of the Fourteenth Amendment.  _See De Jonge v. Oregon_, 299 U.S. 353, 364 (1937); _Gitlow v. New York_, 268 U.S. 652, 666 (1925).  The court only wishes to stress a point that is often missed–when federal government action is not at issue, a plaintiff cannot bring a claim based solely on the First Amendment.  Plaintiff's complaint fails to assert the "correct" amendment under which her "free speech" claims are based.  However, this is, of course, not fatal to Plaintiff's claims, as

11

scholars have noted that "[t]he convention of referring to the First Amendment only through incorporation ... is rarely followed in constitutional law. ALAN K. CHEN, "*Statutory Speech Bubbles, First Amendment Overbreadth, and Improper Legislative Purpose*, HARV. C.R.-C.L. L. REV. 31, 37 n.36 (2003).

Under the First Amendment, "[i]t is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1955 (2006) (quoting *Connick v. Meyers*, 461 U.S. 138, 142 (1983)).[24] In *Garcetti*, the Supreme Court restated the test to apply in First Amendment employment retaliation cases as follows,

> *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Id*. at 1958.

_____

[24]The defendants argue that a refusal to change grades does not constitute "speech." They cite the unpublished opinion *Robbins v. Cleveland Sch. District*, 2005 WL 1312617, No. Civ. A. 2:03CV328-B-A (5th Cir. May 31, 2005) in support of their argument. While the "refusal" to change grades may not constitute speech, Plaintiff's purported speech is more than a mere refusal to change grades. It consists of oral and written complaints regarding the defendants' actions. There is no doubt that "speech" under the First Amendment includes oral and written expressions. *Chalifoux v. New Caney Indep. Sch. District*, 976 F. Supp. 659 (S.D. Tex. 1997). Moreover, Plaintiff's speech is protected under the First Amendment, as more fully discussed *infra*.

12

Breaking down the above quoted language, in order for a plaintiff to make a *prima facie* showing of a First Amendment retaliation claim, he or she must satisfy the following four elements:

(1) the plaintiff's speech must be made in the capacity of a private citizen on a matter of public concern;

(2) the plaintiff must have suffered an adverse employment decision;

(3) the plaintiff's speech must have motivated the defendant's actions (the resulting adverse employment decision); and

(4) the plaintiff's interest in communicating on matters of public concern must outweigh the defendant's interest in promoting efficiency.

*Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999). If the plaintiff can make out a *prima facie* case, then the burden shifts to the defendant to show a legitimate reason for which it would have made the adverse employment decisions even in the absence of the protected conduct. *Coughlin v. Lee*, 946 F.3d 1152, 1157 (5th Cir. 1991). The employee can then refute that showing by bringing forth evidence that the employer's explanation is pretextual. *Id*.

**A.  Speech Made as a Private Citizen on a Matter of Public Concern**

**1.  Plaintiff Was Speaking as a Private Citizen**

There is no dispute that public employees do not give up their First Amendment rights simply because they work for the government. *Id*. at 1957. Rather, the Supreme Court has held that public employees retain First Amendment

13

rights when they speak as "citizens" on matters of "public concern." *Id.*; *Pickering v. Bd. of Educ. of Township High Sch. Dist.*, 391 U.S. 563, 568; *Connick*, 461 U.S. at 147; *Rankin v. McPherson*, 483 U.S. 378, 384 (1987); *United States v. Treasury Employees*, 513 U.S. 454, 466 (1995). Thus to constitute protected speech, Plaintiff's speech must have been made (1) in the capacity of a private citizen; and (2) on a matter of public concern.

Although the court ordered the parties to brief the First Amendment issues in the wake of the Supreme Court's issuance of *Garcetti*, the court has examined that case and realizes that, contrary to the defendants' contention, the holding in *Garcetti* does not dispose of Plaintiff's claims. The Supreme Court in that case did nothing more than expound a standard for determining when a public employee speaks as a "citizen." Putting aside the fact that the Supreme Court forecasted doubt that its holding even applied to academic scholarship or classroom instruction, *Garcetti*, 126 S. Ct. at 1961-62, the court only held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 1960.

In *Garcetti*, a deputy district attorney was fired for writing a memo to his supervisors in which he raised issues of ethical violations regarding a criminal investigation. The court found the "controlling factor" to be the undisputed fact that the district attorney's memo was made pursuant to his employment duties. *Id.* at

14

1959-60. Thus, he "did not speak as a citizen" by "conducting his daily professional activities." *Id*. at 1960.

The district attorney's expressions in *Garcetti* are contrasted with the plaintiff's expressions in *Pickering*. In that case, Marvin Pickering was a teacher who wrote a letter to a local newspaper criticizing the board of education for how they handled past proposals to raise new revenue for schools. The court held that his speech was protected under the First Amendment, and that his termination by the school board on the basis of his letter violated his constitutional right to speak freely on a matter of public concern. *Pickering*, 391 U.S. at 574-75. Pickering's job duties did not consist of writing an op-ed piece regarding the mismanagement of financial resources by the board, which Pickering's letter addressed. On this basis, the court concluded that "it [was] necessary to regard the teacher as the member of the general public he seeks to be." *Id*. at 574.

The cases cited by the defendants all involve public employee's making expressions pursuant to their job duties. Thus in *Gilder-Lucas v. Elmore County Bd. of Educ.*, 2006 WL 1736833, NO. 05-16561 (11th Cir. June 26, 2006), the court held that the school board did not violate a teacher's right to free expression by firing her based upon her responses to a questionnaire posed to her by the school principal. The court held that the record "reveal[ed] no genuine question about whether [the teacher] responded to the [principal's] questionnaire pursuant to her [employment] dut[ies]." *Id*.

15

In *Boykin v. City of Baton Rouge*, 439 F. Supp. 2d 605 (M.D. La. 2006), the plaintiff's expression, in the form of a diversification report, was made while he was "operating in his official capacity as a Human Resources Director." Thus the city's firing of the plaintiff on the basis of his diversification report did not violate the First Amendment. *Id*. at 611.

All *Garcetti* did was elucidate the standard that developed through *Pickering* and its progeny. Plaintiff's speech does not fall within the context of *Garcetti*, *Gilder-Lucas*, or *Boykin*. There is no summary judgment evidence showing that Plaintiff's job duties consisted of writing letters that exposed requests by school administrators to change grades. Her job duties did not require her to go to the media and report that she was being asked to alter her students' grades. To the contrary, her statements to the media were more akin to Marvin Pickering's letter to the local newspaper. Nor was Plaintiff asked to respond to a questionnaire, like in *Boykin*, concerning her satisfaction with the defendants' requests to change her students' grades. Simply put, Plaintiff was not "operating" pursuant to her official job duties when she protested the requests to change her grades–via written letter to Thornhill on November 4, 2004, or when she wrote a letter to each of the Board members complaining of the defendants' requests to change grades, or when she spoke to the media.

## 2. Plaintiff's Speech was on a Matter of Public Concern

Determining whether speech is on a matter of public concern is an issue of

16

law, not of fact. *Rankin v. McPherson*, 483 U.S. 378, 386 n.9 (1987); *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001). The Supreme Court taught in *Connick* that "whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. 138, 147-48 (1983). The court noted that "when employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id*. Review by a federal court is improper where the speech involves matters of solely personal interests. *Ayoub v. Tex. A&M Univ.*, 927 F.2d 834, 837 (5th Cir. 1991) (holding that a professor's complaint about a discriminatory pay scale was not a matter of public concern where the professor's complaint focused on his individual compensation).

That the employee's speech contains an element of personal interest, however, is not fatal to a claim of First Amendment retaliation, however. *Benningfield v. City of Houston*, 157 F.3d 369, 375. An employee's speech that contains a mix between public and private concerns may still be protected. *Id*. Also, the audience to whom the plaintiff complains does not conclusively determine whether the speech is public or private. *See id*. (stating that the fact that the plaintiffs chose to file internal grievances rather than publicize their complaints does not make the speech private); *Thompson v. City of Starkville*, 901 F.2d 456, 466-67

17

(5th Cir. 1990) (stating that the fact that the plaintiff complained to his superiors rather than the public did not preclude a finding that his speech dealt with matters of public concern). One definition that the Supreme Court has offered is that speech that is the subject of "legitimate news interest"is on a matter of public concern. *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004).

In the case *sub judice*, the court holds that as a matter of law Plaintiff's speech was on a matter of public concern. The court has no doubt, however, that her speech also addressed personal concerns. The letter to the Board members most strongly supports this as it was written just 10 days prior to the hearing to determine whether her position as a teacher should be terminated. Nevertheless, the court has examined that letter, along with the other forms of speech, and concludes that there contains a mix between public and private concerns. *Benningfield* 157 F.3d at 375.

Plaintiff's speech touches on her belief that a change of grades would send the "wrong message" to the students of the WFHS–that students do not have to work hard to earn high grades. As she states in her letter to the Board,

I believe that it is wrong to falsify grades and mislead students and parents into thinking that they have achieved something they have not. I also believe that it is wrong for teachers to be harassed and threatened for doing the job they were told to do. Over the years, I have incorporated many pieces of literature to inspire students to stand up for what is right even in the face of adversity. Today, there are many who "talk the talk;" however, to be an effective teacher, leader and role model

18

I must live what I believe by standing up now for what is right.[25]

It can hardly be argued that Plaintiff's concerns do not address "public concerns." *Cf. Dorsett v. Bd. of Trustees for State Colleges & Univs.*, 940 F.2d 121, 124 (5th Cir. 1991) (finding that concerns about academic standards, grade inflation, and student competence are common public concerns)[26]; *see* RICHARD KAMBER & MARY BRIGGS, "*Grade Conflation: A Question of Credibility*," CHRON. HIGHER EDUC., Apr. 12, 2002, at B14 (offering a devastating indictment of the harm that grade inflation inflicts); JOHN W. TEETER, JR., "*The Daishonin's Path: Applying Nichiren's Buddhist Principles to American Legal Education*," 30 MCGEORGE L. REV. 271, 286 n.73 (stating that grade inflation is bad for students receiving inflated grades because the meaningless grades leave them incapable of judging their own performances). Moreover, the Louisiana legislature enacted La. Rev. Stat. 17:414.2 in order to codify restrictions on school officials from ordering teachers to alter grades. This is presumably in response to the public concerns associated with arbitrary grade adjustments. Accordingly, the court holds that Plaintiff has satisfied the first prong of a *prima facie* case for First Amendment employment retaliation.

---

[25]Plaintiff's Exhibit I.

[26]The *Dorsett* court held that the teacher's complaints in that case were of pure personal interests. *Dorsett*, 940 F.2d at 124. The summary judgment evidence in that case only contained "vague references" to the general concerns about academic standards. *Id*. In the case *sub judice*, the court finds the opposite to be true. The court finds that Plaintiff's speech contains more than "vauge references" to the public concerns with grade inflation.

**B.    Plaintiff Suffered From Adverse Employment Decisions**

The second prong requires Plaintiff to prove that she suffered from adverse employment actions made by the defendants. The court acknowledges the general notion that courts should be extremely hesitant "to invade and take over" in the area of education. *See Dorsett*, 940 F.2d at 123-24 (*citing Connick*, 461 U.S. at 138-39). Indeed, a federal court is not the appropriate forum in which to seek redress over "faculty disputes concerning teaching assignments, room assignments, administrative duties ... teacher recognition, and a host of other ... matters." *Id*. However, the Fifth Circuit has made it clear that reprimands and demotions in the educational field constitute adverse employment actions. *Harris*, 168 F.3d at 221. "[F]or purposes of a §1983 retaliation claim, an adverse employment action can include a transfer because it may serve as a demotion. *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999) (citations omitted). "To be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse–such as being less prestigious or less interesting or providing less room for advancement." *Id*. (*citing Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir. 1996); *Click v. Copeland*, 970 F.2d 106, 109 (5th Cir. 1992)).

In the case at bar, Plaintiff brought forth evidence that she was (1) suspended for 5 days in November 2004; (2) suspended for 45 days without pay, and then subsequently placed on probation, following her tenure hearing with the Board; (3)

Case 3:05-cv-00820-JJB-CN    Document 37    02/07/07    Page 20 of 29

was stripped of all of her English classes, except for two, and reassigned as a "library monitor;" and (4) was assigned to tutoring duties when there were no students to tutor. A reasonable jury could find that the aforementioned employment decisions by the defendants resulted in less interesting and prestigious positions than to which Plaintiff was accustomed. After all, Plaintiff was an English teacher for 16 years, and now was forced to take on "library monitor" duties and "teach" study hall classes. Furthermore, the evidence when viewed in a light most favorable to Plaintiff creates an inference that Plaintiff's new duties would likely provide less room for advancement then her previous position would have allowed. Accordingly, the court finds there to be a genuine issue of material fact in dispute as to whether Plaintiff suffered from adverse employment actions.

## C.    Plaintiff's Speech Motivated the Adverse Employment Actions

The court now turns to the third prong of Plaintiff's *prima facie* case, namely proof of causation.

"Whether the employee's conduct was a substantial or motivating factor in an employer's decision to take actions against the employee is a question of fact, ordinarily rendering summary disposition inappropriate. *Click*, 970 F.2d at 113 (*citing Brawner v. City of Richardson*, 855 F.2d 187, 193 (5th Cir. 1988) (holding that summary judgment was inappropriate because the defendant's motive is a material issue of fact)).

21

### 1. Causation as to Thornhill and Lindsey

The court finds there to be a genuine issue of material fact in dispute as to whether Plaintiff's complaints regarding the grade changes motivated the actions taken by Thornhill and Lindsey. First, Plaintiff was placed on her first suspension only one day after she wrote a memo to Thornhill criticizing his attempts to force her to change her students' grades. Lindsey admitted that little investigation took place into the incident resulting in Plaintiff's suspension. He cited Plaintiff's refusal to meet with Thornhill and himself without her union representative present. However, as Lindsey admitted at the Board hearing, Plaintiff did indeed meet with Thornhill in his office at the scheduled time, and without her union representative present.

Secondly, Lindsey brought a charge of willful neglect of duty against Plaintiff on November 16, 2004 for the exact same incident that Plaintiff was suspended for on November 5, 2004. There is an inference that Lindsey's second charge–being the same as the first–was a pretext to retaliate against Plaintiff for speaking out against the order to change grades. Thirdly, Lindsey referred to Plaintiff's comments to the media on the eve of her tenure hearing as a "media blitz." When put in context with the tenure hearing, there is an inference that Lindsey was demeaning Plaintiff's choice to speak to the media. Moreover, Lindsey made it clear to Plaintiff that he did not appreciate the media because its timing coincided with a "death in [the] school family." In addition, Thornhill told Plaintiff that he "didn't appreciate the media." After Plaintiff returned to work from her 45 day

22

suspension, Thornhill reassigned her job duties and told her that she was "not going to complain" about anything because if she did, then he would remember it and she would "be out." Thornhill also allegedly advised Plaintiff to "lose her morals" in order to keep her job.

A reasonable jury hearing this evidence could conclude that it was Plaintiff's speech that motivated the adverse employment decisions made by Thornhill and Lindsey. Accordingly, there are material factual disputes on this genuine issue.

## 2. Causation as to the Board

That Plaintiff's speech motivated the Board's decision to suspend Plaintiff for 45 days is not as clear. The court is unsure as to what evidence connects the Board's actions with retaliation against Plaintiff's speech. Plaintiff has failed to clearly delineate the reasons that causation against the Board is satisfied. Although Plaintiff wrote a letter to the Board ten days before her tenure hearing, there is no evidence in the record to suggest that the Board's decision to suspend Plaintiff was motivated by that letter. Also, Plaintiff has pointed to nothing in the summary judgment record that proves that the Board was aware of the content of Plaintiff's media reports.

The court finds the evidence against the Board as it relates to causation to be "sketchy." This, however, is a common problem in retaliatory cases because "[e]mployers rarely leave concrete evidence of their retaliatory purposes and motives." *Nowling v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994). One

23

factor to consider is the temporal relationship between the employee's conduct and the adverse employment decision. *Id.* This factor cuts somewhat in Plaintiff's favor, as she wrote her letter to the school board only 10 days before her suspension. Moreover, her reports to the media were sufficiently close in time to raise the inference that the Board suspended her because she spoke out against the order to change grades.

Another factor to consider is the employee's prior disciplinary record. *Id.* There is no evidence that Plaintiff had a disciplinary record prior to November 2004. Moreover, the court notes that the Board punished her for the exact same act that she was originally suspended for by Lindsey. Thus, this factor seemingly cuts in Plaintiff's favor.

Finally, it is undisputed that Plaintiff met with Thornhill for the scheduled meeting in his office without a union representative present. Lindsey's charge of willful neglect of duties–which the Board ultimately sustained–was based on Plaintiff's "refusal" to meet with himself and Thornhill. This creates a fact dispute as to whether the Board's decision to suspend Plaintiff was truly based on her "neglect" of duties.

Although the court has expressed its doubts as to whether Plaintiff can prove causation against the Board, it nonetheless refuses to grant a summary dismissal. The court is satisfied that Plaintiff has at least presented sufficient evidence to raise some inferences that the Board acted in retaliation against Plaintiff's exercise of

24

free speech.  Supporting the court's reasoning is the fact that the First Amendment is at issue in this case.  The First Amendment's protection of a citizen's right to criticize public officials and comment on matters of public interest make up the cornerstone of self-government and our democracy.  *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  This broad principle, when coupled with the Fifth Circuit's instruction that causation in retaliation cases is an issue of fact that should not usually be disposed of summarily, constrains the court to deny summary judgment on the causation element.[27]

## D. Plaintiff's Interests in Communicating on Matters of Public Concern Outweighed the Defendants' Interests in Promoting Efficiency

The fourth and final element of Plaintiff's *prima facie* case requires the court to determine whether Plaintiff's interests in complaining about the order to change grades outweighs the school's interests in promoting efficiency.  Factors that courts should consider include: (1) whether the employee's actions involve "public concern;" (2) whether close working relationships are essential to fulfilling the employee's public responsibilities; (3) the time, place, and manner of the employee's activity; (4) whether the activity can be considered "hostile, abusive, or insubordinate;" and (5) whether the activity "impairs discipline by superiors or

---

[27]There is some support for the proposition that even in the absence of a material dispute of fact, the court still may have discretion, in shaping a case for trial, to deny summary judgment as to portions of the case that are ripe for trial. *Powell v. Radkins*, 506 F.2d 763, 765 (5th Cir. 1975).  The court, however, finds that Plaintiff has proven sufficient facts to raise a dispute as to the causation element against the Board.

Case 3:05-cv-00820-JJB-CN    Document 37    02/07/07    Page 25 of 29

harmony among coworkers." *Click*, 970 F.2d at 112. A stronger showing of disruption is necessary if the employee's speech involves matters of public concern. *Id*.

First, the court has already concluded that Plaintiff's speech addressed a matter of public concern. Secondly, while the court recognizes that close working relationships are essential to school settings and to promote effective teaching, there is nothing in the record to suggest that Plaintiff's speech disrupted such working conditions. Her letters were sent directly to Thornhill and the members of the Board; they were not distributed widely throughout the school. Moreover, while Lindsey was concerned that the timing of Plaintiff's reports to the media was inappropriate, since there was a "death in [the] school family," nothing in the record suggests her media reports caused any disruption. Thirdly, Plaintiff's protests were not made in a chaotic or disruptive manner, nor can her speech be labeled hostile or abusive. While perhaps Plaintiff's failure to change the grades could conceivably be construed, in a strict sense, as an act of insubordination, there is a fact dispute as to whether Plaintiff was even permitted by law to change the grades. In any case, her protests, which constituted an exercise of First Amendment rights, cannot be construed as "insubordination." Finally, nothing in the record suggests that Plaintiff's speech impaired the ability of her superiors to discipline her. To the contrary, Plaintiff's superiors *did* discipline her.

The court finds that Plaintiff's interests in engaging in protected speech

26

outweighed any interests the WFHS had in promoting the efficient functioning of the school.

## E.    The Defendants' Proffered Reason for Making Adverse Employment Decisions and Evidence of Pretext

Plaintiff has overcome her burden of proving a *prima facie* case of First Amendment retaliation. The burden now shifts to the defendants to proffer a legitimate reason for which they would have made the adverse employment decisions in the absence of Plaintiff's protected conduct. *Coughlin*, 946 F.2d at 1157. The defendants assert that Plaintiff was suspended initially on November 5, 2004 because she refused to meet with Thornhill and Lindsey, without her union representative present, in order to discuss the issue of grade alteration. This was also the same reason that the Board suspended Plaintiff for 45 additional days, without pay, beginning January 26, 2005. The defendants maintain that Plaintiff's actions constituted a willful neglect of duty, and thus her suspensions were appropriate, pursuant to La. Rev. Stat. 17:443.[28] The court is unclear, however, as to what legitimate reason justified reassigning Plaintiff to the position of "library monitor," and stripping her of most of her English classes.

Willful neglect of duty is a legitimate reason to take adverse employment actions against a teacher. La. Rev. Stat. 17:443. Thus the burden shifts back to Plaintiff to bring forth evidence of pretext. The court believes that Plaintiff has

---

[28]Plaintiff's Exhibits B and D.

27

satisfied her burden.

As to the defendants' charge that Plaintiff willfully neglected her duties, Plaintiff has brought forth evidence showing that she in fact did meet with Thornhill at the scheduled time to discuss the grade change issue. Moreover, Plaintiff arrived at Thornhill's office without a union representative, as ordered by Thornhill and Lindsey. The summary judgment evidence indicates that Plaintiff was directed to meet with Thornhill and Lindsey at 2:45 p.m. on November 5, 2004. On November 4, Plaintiff delivered a memo to Thornhill in which she reasserted her purported right to have her union representative present with her at the meeting. In the morning on November 5, Thornhill spoke with Plaintiff in the hallway, and Plaintiff again reasserted her right to have her union representative present. Thereafter, but before 2:45 p.m., Lindsey issued a letter to Plaintiff explaining that she intentionally disobeyed her superior's orders, and therefore he was suspending her for five days. The timing of Lindsey's letter is critical. Lindsey suspended Plaintiff *before* her scheduled meeting. And as Lindsey admitted at the tenure hearing, Plaintiff did in fact arrive at Thornhill's office at 2:45 p.m., and without her union representative. Thus, Plaintiff has presented evidence showing a factual dispute as to whether the defendants' proffered reason for suspending her was legitimate. Even more support of pretext is found in Lindsey's admission that little to no investigation took place before Plaintiff's November 5 suspension.

Moreover, the defendants have not offered a legitimate reason as to why they

28

reassigned Plaintiff to the less-interesting and less-prestigious positions upon her return from suspension in March 2005. Plaintiff was a 16 year veteran in education, 12 of which she served for the WFSS. The court struggles to understand why a teacher as experienced as Plaintiff would be assigned to "library monitor" and "study hall" duties. In any event, the court holds that the summary judgment evidence presents a factual dispute that the defendants' proffered reason for suspending and "demoting" Plaintiff was false, and was instead a pretext to retaliate against her for complaining about the order to change her students' grades. Accordingly, the court finds that Plaintiff has satisfied her burden in overcoming summary judgment. FED. R. CIV. P. 56(e).

## Conclusion

Accordingly, the defendants' motion for summary judgment (doc. 30) is hereby DENIED. It is so ordered.

Baton Rouge, Louisiana February 7th, 2007.


JAMES J. BRADY, DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA

Case 3:05-cv-00820-JJB-CN   Document 37   02/07/07   Page 29 of 29